# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

ROSA MARGARITA ARSUAGA-GARRIDO,
    Plaintiff,

v.

ALEJANDRO MAYORKAS, SECRETARY,
DEPARTMENT OF HOMELAND SECURITY,
    Defendant.

CIV. NO. 18-2031 (MDM)

## OPINION AND ORDER

Plaintiff Rosa M. Arsuaga ("Arsuaga" or "Plaintiff") brings this action against her former employer, the Federal Emergency Management Administration attached to the United States Department of Homeland Security ("DHS" or "Defendant") for alleged violations to The Rehabilitation Act of 1973, 29 U.S.C.A. § 701 *et seq*. ("The Rehabilitation Act"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e *et seq*. ("Title VII"). More specifically, Plaintiff argued in the complaint that she was subjected to discriminatory treatment when she was not provided a feasible reasonable accommodation for her disability, was subjected to disability-based harassment, and was eventually terminated from her temporary employment because of her disability. The claims asserted by Arsuaga pursuant to Title VII were previously dismissed with prejudice. (*See*, Opinion and Order at Docket No. 47). As such, only three claims remain: (1) disability discrimination; (2) failure to provide a reasonable accommodation; and (3) hostile work environment, all under the Rehabilitation Act.

Presently before the Court is the Defendant's Motion for summary judgment in which the Defendant moves to summarily dismiss the three remaining claims asserted by Arsuaga in the complaint. (Docket No. 50). Plaintiff filed a brief opposing summary judgment (Docket No. 62). The Defendant then requested, and was granted, leave to file a reply but never filed one. Both parties filed their respective statements of uncontested material facts with their summary judgment papers. After a close examination of the

evidence on record and a careful review of the applicable statutes and case law, the Court **GRANTS** the Defendant's motion for summary judgment.

## I.   **Preliminary Matters: Arsuaga's Affidavit**

Before moving onto the arguments which the parties believe dispositive, the Court must first resolve an objection raised by the Defendant to Arsuaga's use of her affidavit in support of her opposition to summary judgment. The Defendant argues that Arsuaga intends to support the majority of her Statements of Additional Facts solely with her own affidavit. (*See,* Exhibit V, Attachment 4, Docket No. 63-4.) According to the Defendant, Arsuaga's declaration constitutes nothing more than her own characterization of the facts, conclusory allegations, and arguments not supported by the record.

As an initial matter, on summary judgment, Rules 56(a) and (b) of the Federal Rules of Civil Procedure, provide that plaintiff and defendants may move for summary judgment "with or without supporting affidavits." Fed. R. Civ. P. 56(a)-(b). A party asserting that a particular fact is undisputed must support that assertion "by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, *affidavits or declarations*, stipulations. . ., admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *Ortiz-Osorio v. Municipality of Loiza*, 128 F. Supp. 3d 442, 446 (D.P.R. 2015).

When, like here, a party uses affidavits or declarations as support, they "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). *See also,* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"). Furthermore, under federal law, to support or oppose a motion for summary judgment, a party may offer an unsworn statement that is signed under penalty of perjury in compliance with 28 U.S.C.  § 1746, in lieu of a sworn statement or affidavit. And, generally, evidence in the form of an affidavit is equal to other forms of evidence, such as deposition testimony. *See,* 10A Wright & Miller, Federal Practice & Procedure § 2727 (3d ed. 2011) ("facts asserted by the party opposing the [summary

judgment] motion, if supported by affidavits or other evidentiary materials, are regarded as true.").

Even a clearly self-serving affidavit constitutes evidence which the court must consider when resolving summary judgment motions. *Malave-Torres v. Cusido*, 919 F. Supp. 2d 198, 204 (D.P.R. 2013); *See, Cadle Co. v. Hayes,* 116 F.3d 957, 961 n.5 (1st Cir. 1997) ("A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment."). The self-serving nature of the affidavit, alone, does not preclude the Court from considering an affidavit at summary judgment. *Pérez-Maspons v. Stewart Title Puerto Rico, Inc.*, 208 F. Supp. 3d 401, 408 (D.P.R. 2016). *See, Malavé-Torres*, 919 F. Supp. 2d at 204 (compiling circuit precedents allowing self-serving affidavits as admissible evidence at summary judgment).

Now, it is true that most of Arsuaga's proposed facts and supportive arguments draw support, for the most part, from her own declaration. In fact, the bulk of Arsuaga's evidence rests exclusively on her own declaration. The Defendant therefore complains of Arsuaga's overt reliance on her declaration to survive summary judgment. Though Arsuaga relies heavily on her own declaration, and subjective depiction of events, which is indeed self-serving, she does allege specific facts based presumably on her personal knowledge. As the forecited case law explains, nothing in Rule 56 of the Federal Rule of Civil Procedure prohibits an affidavit from being self-serving, and the self-serving nature of Arsuaga's declaration, without more, is not fatal to her cause. While Arsuaga's declaration is subjective, self-serving, and conveniently drafted to assist her in this litigation, the case law supports the notion that self-serving affidavits may be considered by a court in resolving a motion for summary judgment. As such, this Court will consider Arsuaga's affidavit in the resolution of the pending summary judgment motion. But, if the conclusory assertions made by Arsuaga in the affidavit are not corroborated by other evidence, and her case rests merely on conclusory allegations and unsupported speculation, summary judgment may be appropriate. *See, Forestier Fradera v. Mun. of Mayaguez,* 440 F.3d 17, 21 (1st Cir. 2006).

## II.    Relevant Factual Background

Taking all disputed facts in the light most sympathetic to the Plaintiff, as the party opposing summary judgment, the Court makes the following factual findings, which are either undisputed or supported by the evidentiary record.[1]

On April 1, 2011, the Social Security Administration found Arsuaga to be too disabled to work. According to Arsuaga, on January 2, 2015, she decided to participate in a Social Security Administration program called Trial Work. As part of that program, on July 10, 2016, Arsuaga began working for the Federal Emergency Management Agency ("FEMA").[2] At all relevant times, Arsuaga worked as a "Reservist" in the Human Resources Division until the Defendant terminated her employment on January 18, 2018, allegedly based on performance issues, misconduct, and insubordination.

Arsuaga was hired as a temporary and intermittent employee.[3] Her appointment was for less than two years, and the position had a "not-to-exceed date" of March 31, 2018. Louis Pérez ("Pérez") made the decision to hire Arsuaga. He was the FEMA Manager in the DHS Virginia Human Resources Operations Division Office. Pérez was Arsuaga's supervisor at all relevant times of her employment. Pérez never met Arsuaga in person, as they were always stationed in different locations, and their conversations were mostly electronic (via email).

Arsuaga's position required her to travel to different sites, known here as deployments, to assist in FEMA relief efforts. Arsuaga's major duties required her to remain on call for deployments into various areas of the United States and Puerto Rico when a disaster was declared to fulfill the job duties of a Certified Human Resources Specialist. Arsuaga's starting salary was $12.42 per hour.

---

[1] Pursuant to Local Rule 56, the Court will only deem as genuinely opposed those statements of material facts which the objecting party properly denied or qualified in strict compliance with Local Rule 56(c). The Court also credits only facts properly supported by accurate record citations. *See,* Local Rule 56(e). Finally, the Court has disregarded all arguments, conclusory allegations, speculation, and improbable inferences disguised as facts. *See, Forestier Fradera v. Municipality of Mayaguez,* 440 F.3d 17, 21 (1st Cir. 2006); *Medina-Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990).

[2] FEMA is a component of the Department of Homeland Security and is responsible for, *inter alia,* administering and coordinating the Federal government's response to presidentially declared disasters pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), 42 U.S.C. §§ 5121 *et seq.*

[3] FEMA hires temporary personnel through the establishment of "reservists." Reservists are given temporary appointments to directly support the response and recovery efforts of disasters through deployments to the disaster sites.

On July 11, 2016, Arsuaga was deployed to Anniston, Alabama, to attend an initial orientation. According to Arsuaga, before attending the orientation and training program, she called the Equal Employment Opportunity Specialist in Alabama to request permission to attend the training program with her ten-pound Maltese breed dog as an emotional support dog. The dog's name is "Hanna." Shortly thereafter, Arsuaga was deployed to Bluemont, Virginia, to attend another training program. On July 25, 2016, Arsuaga submitted a formal request for an accommodation because she allegedly suffered from an emotional condition. The accommodation consisted of allowing her emotional support dog to attend the classroom with her during training sessions and allowing the dog to sit on the floor next to her chair, or underneath the table, and accommodate a dog carrier where the dog could sit.

In reviewing Arsuaga's request for an accommodation, her supervisor Pérez identified a few problems with it and directed Arsuaga on how to correct the errors made so that her request could be approved. During an email exchange with Pérez, Arsuaga clarified that her request to have her emotional support dog as an accommodation was only meant for "training trips" and not for FEMA deployments. Arsuaga attested that her request for accommodation was so limited because, at that time, she did not know if she would accept deployments. Pérez responded that he had no issue with Arsuaga's request being limited to trainings. As requested by Pérez, Arsuaga submitted a formal request for accommodation for her dog.

Pérez was responsible for processing Arsuaga's accommodation request in coordination with FEMA's Disability Employment Program Manager ("DPM"), which is ascribed to the Office of Equal Rights. Pursuant to FEMA policy, and the Reasonable Accommodation Program, Pérez discussed Arsuaga's accommodation request with FEMA's Office of Equal Rights (hereinafter "OER") to comply with his responsibilities as the deciding official of Arsuaga's request. According to Pérez, he did not know what Arsuaga's disability was.

On July 25, 2016, the same day that Arsuaga submitted her official request for accommodation, Pérez granted the request as an *interim* accommodation and notified Arsuaga to that effect. Pérez also told Arsuaga that if she wanted to request further accommodations to have her emotional support dog in the workplace beyond the initial

training week, she needed to provide him with medical documentation stating her disability, why the animal was needed in the workplace, and why such accommodation was medically necessary.

On August 7, 2016, Arsuaga received a salary increase to $16.30 per hour. On October 6, 2016, Arsuaga was deployed to Atlanta, Georgia, to assist with FEMA's disaster relief efforts. On December 11, 2016, Arsuaga received another salary increase to $18.64 per hour.

On December 29, 2016, in an email exchange between Arsuaga and Pérez concerning her accommodation, Pérez reiterated that the accommodation previously approved for Arsuaga on July 25 was for a *temporary* accommodation. Pérez again told Arsuaga that if she intended to have her emotional support dog with her *in the workplace* (not just for her initial trainings), she had to make a request to that effect. In a discourteous tone, Arsuaga replied to Pérez that: she would not accept his argument that she was granted a temporary accommodation; that "[t]here is no such thing under federal law;" that her attending physicians would not provide Pérez with any confidential medical information that Pérez insisted on obtaining; and that she was not "required by federal law to provide [Pérez] with any information regarding what [her] dog service is." According to Arsuaga, the basic medical information that Pérez lawfully requested to analyze her request for accommodation was confidential.

Pérez responded to Arsuaga by clarifying that, as her supervisor, it was his responsibility to approve requests for accommodations and that he works closely with OER "to ensure [the] laws are followed" and that "everything is done to set [Arsuaga] up for success." Pérez also said that, given the accommodation requested, he is authorized to request documentation from Arsuaga's physician with respect to what her disability is, if her dog is required to be in the workplace, and why. In reply, Arsuaga again objected to divulging the requested information and once more alleged that her physicians would not provide any medical information to support her request. She also repeated that "there is no such thing as a temporary accommodation."[4]

---

[4] As a legal matter, Arsuaga is incorrect in her assertions.

The next day, on December 30, 2016, Arsuaga emailed Pérez and Foudiya Henri ("Henri"), FEMA's Disability Employment Program Manager, regarding her travel request for a job post, saying that she would be traveling with her emotional support dog. A few days later, on January 3, 2017, Henri responded to Arsuaga and told her that *all* FEMA employees were required to have an approved accommodation in order to have a service or emotional support animal in the workplace. Henri stressed the fact that Arsuaga did *not* have such an approved accommodation and further clarified that the accommodation that had been requested and approved for her was an *interim* or temporary accommodation that had been granted to her when she was deployed for her initial trainings only. Henri urged Arsuaga to carefully review the temporary approval of her accommodation, granted back on July 25, 2016. Henri repeated to Arsuaga that if she wanted the *continued* use of a service or emotional support animal in the workplace and on her deployment locations, Arsuaga had to request such accommodation and work with Pérez towards that end.

Arsuaga responded to Henri by asserting that her "treating physician will not provide the information being requested by Louis Pérez because it is against federal law to request such confidential medical information on any person/employee." Notwithstanding Arsuaga's continued objections to provide the required medical information, she finally sent it to Pérez and made a formal accommodation request to be allowed to travel with her emotional support dog for her deployments and have the dog with her at the workplace. On that same day, January 3, 2017, Pérez granted Arsuaga's request as an *interim accommodation*. In approving such request, Pérez noted that based on the documentation provided, the temporary accommodation that had been granted on July 25, 2016, was being *extended* for one (1) year from the date of its approval. As such, Arsuaga was granted an interim accommodation to have her emotional support in the workplace and during her deployments. The accommodation was set to expire on January 3, 2018. Pérez told Arsuaga that if she wanted to extend the accommodation beyond January 3, 2018, she had to request it directly through him prior to that date, and provide specific information, including information on the animal's updated vaccinations and trainings. Pérez also instructed Arsuaga to please contact him if she had any problems

implementing her approved interim accommodation so that he could be "given an opportunity to resolve any issues."

A few days later, on January 8, 2017, Arsuaga received another salary increase to $18.94 per hour. On January 9, 2017, she was deployed to Leesburg, Virgina, for Emergency Manager Orientation. On February 21, 2017, Arsuaga was deployed to Sevierville, Tennessee, to assist with FEMA's disaster relief efforts.

On March 10, 2017, there was an issue with Arsuaga's travel expenses for one of her deployments. It appears that Nancy Huffman ("Huffman"), a Travel Specialist, had made reasonable deductions to Arsuaga's billed work expenses in accordance with company policy and had contacted Arsuaga via email to resolve the matter. Arsuaga responded very rudely to Huffman's inquiry and challenged the deductions made by asking for copies of the policies requiring the deductions, by saying that Huffman went on a fishing expedition with her voucher, accusing Huffman of incompetence and by rudely saying that she would proceed with the matter "at a higher level." Pérez had been copied in Arsuaga's response and he immediately reprimanded and counseled Arsuaga on the inappropriate and accusatory tone used by her in addressing Huffman, a fellow co-worker. In an email, Pérez stated:

> I think your response to Nancy below was *unnecessarily rude*. Nancy is a Travel Specialist trying to assist you. As a Human Resources Specialist[,] I expect your communications to always be courteous and respectful. Saying that she went on a fishing expedition with your voucher was uncalled for. A better approach would have been to ask Nancy to help you understand why she made the deductions. Please take care in how you communicate with others. Remember you represent the Agency, OCCHCO, and the HR Cadre. Thank you.

Notwithstanding that warning, Arsuaga later sent additional emails that Pérez and other DHS personnel deemed as inappropriate and unprofessional, which according to the Defendant reflected poorly on Arsuaga and the agency.

A couple of months later, on June 5, 2017, Arsuaga was deployed to Oklahoma City, Oklahoma, to assist with FEMA's disaster relief efforts. On September 12, 2017, and September 14, 2017, Arsuaga was again deployed to different states.

On October 2, 2017, there was an alleged incident with Arsuaga's dog. Arsuaga maintains that her dog was startled by a co-worker, causing the dog to start barking at the co-worker. According to Arsuaga, another employee subsequently asked her about her emotional support dog, and she explained that she had an accommodation to have her dog at the job site. Also, as stated by Arsuaga, a few days later, Tommy Wall, Human Resources Lead, informed her that there had been complaints about her dog and he told her that it had to leave the work site, which at that time was the Joint Field Office in Orlando, Florida. On October 13, 2017, Arsuaga filed a formal grievance for alleged disability discrimination and harassment with the OER for the events that transpired in Orlando.[5]

On December 4, 2017, Arsuaga was deployed to Guaynabo, Puerto Rico, to assist with FEMA's disaster relief efforts.

On December 23, 2017, Arsuaga responded to an email from Treva Horton-Baker, Human Resources Unit Leader, where Horton-Baker questioned Arsuaga about her scheduled work hours and requests for time off. In an unprofessional manner, Arsuaga replied that "[a]s a professional, I do not have the need to request from you eight (8) hours of pay."

On January 7, 2018, Arsuaga received a salary increase to $19.26 per hour.

On January 9, 2018, Arsuaga had a conversation with Bryon Grable where he told her that he had received several complaints about her dog scratching her back on the office rug and rumors that the dog had worms. In an email drafted that day, Arsuaga told Grable that such information was false and that her dog is constantly evaluated by her attending veterinarian in Puerto Rico and that she has a clean bill of health. Grable responded by stating that he did not mean to talk negatively about her dog and that he believed her if she said her dog had a clean bill of health. Grable nevertheless requested Arsuaga to understand that he mentioned the complaints to her because they involved proper sanitary measures with a dog in the workplace.

---

[5] As reported by Arsuaga, this was not the first instance of alleged harassment and disability discrimination that she allegedly suffered while working for FEMA. Because the alleged incidents that Arsuaga puts forth to support her claims under the Rehabilitation Act have no bearing on the outcome of the case, the Court need not discuss the specifics of the incidents narrated by Arsuaga.

On January 10, 2018, Juanita Froelich, Human Resources Manager, reported to her supervisor, Michael Vasquez, that on December 5, 2017, she was bringing a benefits form to Arsuaga for handling and when she reached over to place the form on the table in front of Arsuaga, her dog, which Froelich says she did not know was sitting on Arsuaga's lap, bit her hand. According to Froelich, her skin was not broken but the incident startled her and caused her to yell loudly. Arsuaga denies that the dog bit Froelich (or any other employee).[6]

In addition to the incident where Arsuaga's dog purportedly bit Froelich, Pérez maintains that he received several other complaints regarding Arsuaga's dog from different employees at different deployment sites.

On January 11, 2018, a meeting took place between Arsuaga, Victor González, Equal Rights Advisor, María Rodríguez, Equal Rights Advisor, and Sam Ross, Human Resources Manager, regarding the expiration of Arsuaga's interim accommodation for the use of her emotional support dog in the workplace. As noted above, the accommodation expired on January 3, 2018. Although Arsuaga had been instructed to request an extension of the accommodation before its expiration, apparently, she had not

---

[6] In her brief in opposition, Arsuaga argues that the Court cannot rely on the statements made in some emails between various FEMA employees, which narrate incidents with, and include complaints of, Arsuaga's dog. The Defendant offered in evidence various emails that include complaints of the dog and alleged misconduct by the animal in order to show that Arsuaga's dog engaged in "disruptive and aggressive" behavior at different job sites. Arsuaga objects to these emails on hearsay grounds because the Defendant has not authenticated the emails. The Court must resolve this argument without the benefit of the Defendant's response because no Reply brief was filed in this case. In any event, the Court finds that Arsuaga's argument lacks force for various reasons.

First, the emails are not hearsay because they were used by the Court to show that the communication occurred, not to prove the truth of the matters asserted in them. *See, Espedito Realty, LLC v. Nat'l Fire Ins. Co. of Hartford*, 935 F. Supp. 2d 319, 325 n.3 (D. Mass. 2013) (holding that emails are not hearsay because they are offered to show that communications occurred, not to prove truth of matters asserted in them). Indeed, the Court did not take as true what was said in any given email regarding Arsuaga's dog, but rather that such communication took place. For example, the Court did not find, based on an email, that because Froelich said that Arsuaga's dog bit her, the dog, *in fact*, bit Froelich. To the contrary, in constructing the factual background, the Court considered and narrated both "sides" of the story and carefully drafted it using terms as "Froelich *says*" the dog bit her hand, and "Arsuaga *denies*" that the dog ever bit anyone. Indeed, the Court did not make any credibility determinations based on the information contained in the challenged emails nor did it decide any genuine question of material fact. Because so much of the evidence here was submitted through e-mails, the Court considered the emails, *not* for the truth of the matter asserted in them, but to show that a communication or complaint was made about Arsuaga's dog.

Second, the Court notes that, after reviewing the record, it became clear that Arsuaga appears to be "picking and choosing" which e-mails she challenges on hearsay grounds depending on whether the content of the e-mail is favorable to her cause. For instance, Arsuaga challenges the emails offered by the Defendant which pertain to alleged misconduct by her dog. This, of course, is not dispositive but worth mentioning. Finally, even if the Court gave Arsuaga the benefit of a doubt and completely disregarded the challenged e-mails as hearsay, there is no need for the Court to parse this matter further because the challenged evidence will prove to be irrelevant to the ultimate resolution of this case.

done so. During the meeting, however, Arsuaga requested an extension of the interim accommodation for her dog. According to Arsuaga, she was not informed in the meeting of any complaint(s) regarding her dog's behavior during any of her deployments. After the meeting, Arsuaga made a formal written request (via email) to extend her interim accommodation and sent the necessary documentation to Pérez.

Later that day, at 4:17PM, Arsuaga emailed Pérez and the other meeting attendees to inform them that she would *not* be reporting to duty at the FEMA Joint Field Office ("JFO") until she received an approval of her request to extend her accommodation. At 4:38PM, Pérez replied by stating that he was working on Arsuaga's request. The Defendant maintains that Arsuaga's accommodation had to be placed on hold pending a review by Pérez and FEMA's OER Office of the various complaints it had received of alleged disruptive and aggressive behavior on the part of Arsuaga's dog while in FEMA facilities. In the email, Pérez asked Arsuaga to please understand that while he intended to approve her request, the final approval would not be available until Pérez received feedback from the OER, which could take a couple of days.

At 4:43PM, Pérez sent another email to Arsuaga where he stated that he was concerned over the numerous complaints he had received regarding the behavior of Arsuaga's dog during each of her deployments. Pérez noted that he would discuss his concerns with OER and made a point of telling Arsuaga that he wanted her to know of the complaints because he wanted to give her an opportunity to explain the incidents and discuss how she planned to mitigate these types of incidents in the future. At 5:03PM, Arsuaga responded to Pérez by reiterating that she would not be reporting to her work site (at that time, the JFO) without her emotional support dog. Arsuaga then sent another email to Pérez where she stated: "[a]dditional note. Please put in writing to me each of the complaints . . . Your behavior is more than abusive."

On January 12, 2018, at 1:48PM, Froelich reported to Pérez that on December 5, 2017, Arsuaga's dog bit her hand.

That same day, at 3:07PM, Pérez sent Henri a summary of the complaints he had received regarding Arsuaga's dog. The summary included complaints from Arsuaga's deployments to five different sites. The alleged complaints included: the dog biting Froelich's hand, the dog dragging its butt across the carpet, the dog barking at people,

the dog becoming aggressive with FEMA employees, the dog being unleashed and almost biting FEMA employees, the dog being disruptive in the workplace, Arsuaga lacking sufficient control over the dog, and Arsuaga being demobilized early from a deployment due to issues with her dog. According to Pérez, the complaints dated back to October 2016, February 2017, June 2017, December 2017, and January 2018. According to Pérez, he also had a conversation with Henri regarding Arsuaga's accommodation for her emotional support dog. Arsuaga denies any incident with her dog.

On January 12, 2018, Pérez sent an email to Vasquez, the person that was currently supervising Arsuaga at her deployment, and Heather Briggs, which stated:

> I would like to come together on an interim solution/accommodation for Rosa [Arsuaga] so she can continue to work while I investigate and seek further consultation on how to proceed after the dog bite and given a now established pattern of undesirable behavior by the dog. I hope to have a resolution early to mid-next week. In the meantime, can you explore options to keep Rosa engaged and working, i.e., teleworking, half-days, extended lunches, etc.?"

Per Arsuaga's declaration, on that day, she suffered a relapse of her major depressive disorder, which forced her to seek urgent medical care.[7] Indeed, the record includes a medical certificate which says that Arsuaga visited a medical clinic in Loíza, Puerto Rico, on January 12, 2018, that she was treated (the document does not say for what condition), and that she could return to work on January 16, 2018.[8]

The following day, January 13, 2018, Michael Vasquez responded to Pérez' email and informed him of the concerns he had with Arsuaga, aside from the issues with her dog. According to Vasquez, Arsuaga had been counselled for claiming improper hours on her timecard and for being defiant towards payroll personnel. Vasquez also said that Arsuaga: sits in her desk and will only "do the things she is told to do;" if she has no assigned tasks, she does not ask for work; she improperly uses her phone several times a day for thirty (30) minutes or longer; she has people at her desk chit-chatting for thirty (30) minutes or more on a daily basis; and she takes her dog out for walks multiple times

---

[7] Other than her own declaration, there is no objective medical evidence in the record to support such a claim. The Court, however, taking all inferences in Arsuaga's favor, assumes her assertion to be true.

[8] The certificate does not include further details, nor does it contain a medical diagnosis, or anything indicating that the visit pertained to Arsuaga's mental condition, as she suggests.

a day. Vasquez told Pérez that he had instructed Sam Ross and Carol P. Smith, Human Resources Duty Lead, to provide written counseling to Arsuaga, but that Arsuaga had left the workplace the day before and had not returned to work. Vasquez said that Arsuaga would be counselled at the next opportunity.

Shortly thereafter, Pérez responded to Vasquez' email by requesting more specific information about the incidents he had described with Arsuaga. Pérez clarified that if Arsuaga was not specifically told to ask for more work, that he could not fault someone for doing what they are told to do. Regarding Arsuaga's timesheets, he said Arsuaga could not charge time for her dog walks and that it appeared to him that her time needed to be more closely supervised. Pérez also told Vasquez that if they are not able to counsel Arsuaga in person, presumably because she had left the workplace without providing notice, they needed to do it over the phone.[9] Pérez explicitly noted that: "her accommodation is not an excuse for poor performance, however, we must take care to keep these issues separate so as to avoid the appearance of discrimination." Pérez lastly said that he was scheduled to discuss the dog issues with OER in the coming days and hoped to have a decision on Arsuaga's accommodation request soon.

Also on January 13, 2018, Gina Steward, Human Resources Specialist, sent an email to Pérez corroborating Froelich's complaint that Arsuaga's dog bit her. More specifically, Steward said that on or around December 5, 2017, she witnessed Froelich's hand being bitten by Arsuaga's dog. Steward confirmed Froelich's statement that Froelich came over to Arsuaga's desk to give her a form for processing and the dog, who was sitting on Arsuaga's lap, bit her hand. Steward said that Froelich reacted by pulling her hand away from the dog and yelling loudly. Arsuaga denies this occurrence.

On January 16, 2018, Vasquez instructed Carol P. Smith to counsel Arsuaga on the incidents he had described and to explain to her the issues with her dog. In an email, Vasquez summarized the issues as follows:

> There have been multiple occurrences where [Arsuaga's] dog was aggressive towards staff. I have one confirmed report of the dog biting someone, and other unconfirmed reports. Per ERO, the dog is not supposed to be barking at staff, and

---

[9] Viewing the evidence in the light most favorable to Arsuaga, the Court assumes that Arsuaga left the workplace because of her alleged mental condition. Based on the evidence of record, it appears that when Arsuaga left the workplace, she did not provide notice of a health emergency to her employer.

definitely not biting people. Per Louis Pérez, her timecard
needs to reflect when she takes the dog for walks; FEMA
should not be charged for that time.

As per Vasquez' instructions, it seems that Carol P. Smith ("Smith") called Arsuaga
to counsel her on specific issues that had been brought to her attention with respect to
Arsuaga's work performance. According to Smith, she explained to Arsuaga that, as her
Human Resources Duty Lead, it was part of her duties to hold Arsuaga accountable for
her work time and that it was Arsuaga's responsibility to inform a supervisor when she
would be absent from work, leaving the office or sick. The email states that Smith
counselled Arsuaga on the proper reporting of her billable hours and leaves of absence.
Smith also said that she counseled Arsuaga regarding her alleged use of multiple and
extended breaks throughout the day, personal phone usage during work hours, and
excessive visitors to her desk to pet her dog and engage in small talk during work hours.
After their conversation, Smith sent Arsuaga an email summarizing what had been
discussed.

Arsuaga responded to Smith's email by denying any misconduct on her part or that
of her dog and labeling the matters brought to her attention as "fabricated issues." In the
afternoon of January 16, 2018, Arsuaga sent an email to Smith, which stated, in relevant
part:

[w]ho do you think you are and who do you think I am?. . . [d]o
not be so incompetent to fabricate issues without evidence. . .
I receive in my desk whoever I want and whoever wants to
pet my dog. Too bad you cannot say the same thing because
nobody wants to go and visit an incompetent. All you do
during the day is nothing, just come in late, leave early and
spend the day talking and walking around doing nothing. A
shame for an HR person.

On January 16, 2018, at 2:51PM, Arsuaga emailed Pérez, González and Corey
Coleman, Chief Component Human Capital Officer, saying that, as of that date, she had
not received an approval of her January 11, 2018, request to extend her accommodation
for her emotional support dog. In the email, Arsuaga stated that she "now underst[ood]
why no one wants to deal with" Pérez. Later, at 3:15PM, Pérez replied to Arsuaga and

explained that, as he had previously notified her, he was working with the OER to establish her reasonable accommodation, but it may take a couple of days.

Pérez also told Arsuaga that:

> Based on recent events, [we] are re-assessing the provisions of your accommodation and seeking guidance from a Service Animal SME (subject matter expert) (SME) in the Agency. We are also communicating with the ERO at DR4339-PR to identify an appropriate course of action in implementing your new RA (reasonable accommodation) and reintegrating you and Hannah back into the workplace. Please be patient and I will get back to you within 24 hours.

Then, at 3:35PM, Arsuaga replied by stating that she did not understand Pérez' email. Arsuaga asked why Pérez was making "an issue" of her and her dog. She also asked what a "service animal SME" was and clarified that her dog is not a service dog, but rather an emotional support dog. At 4:04PM, Pérez responded to Arsuaga by asserting that the matter of her accommodation was under review because her dog (allegedly) bit another FEMA employee in the workplace and, as such, he was seeking guidance from a service animal SME because the matter involved the conduct of a dog in the workplace. Though Pérez expressed his concerns with Arsuaga's dog in full transparency with her, he specifically indicated that he intended to approve her request to extend her accommodation. Before doing so, however, Pérez said that Heather Briggs, Equal Rights Advisor, was scheduled to discuss with Arsuaga the provisions of the accommodation. After that discussion took place, Pérez told Arsuaga that he would then be in a position to approve her request. Pérez also said that it was determined by the DHS that Arsuaga would not be able to return to the building where her dog purportedly bit another FEMA employee and that he would work with Human Resources to determine whether Arsuaga could work with her dog in one of the branch offices, and, if not, she would be demobilized from that site and sent to another deployment.

At 4:15PM, Pérez discussed the matter of Arsuaga's accommodation with other human resources and supervisory personnel, including Vasquez, who was currently supervising Arsuaga at the deployment site. Pérez indicated that, with respect to the extension of Arsuaga's accommodation, the Equal Rights Advisor at her current location would discuss the provisions of the accommodation with Arsuaga to ensure that she

understands the parameters of having her dog in the FEMA workplace. Pérez also said that the Equal Rights Advisor would document such discussion, and once he received that documentation, he would approve Arsuaga's request to extend the accommodation. In the email, Pérez also said that FEMA personnel at the site where the dog allegedly bit Froelich did not want the dog back in the site and the ERO office agreed that the dog should not return to that specific location. The ERO recommended that Arsuaga be allowed to work at an alternate site, if possible, during that deployment.

At 4:17PM, Arsuaga replied to Pérez' email telling him, in an accusatory manner, that his information was "false and fabricated," that he better have sufficient evidence to sustain his allegations, and for Pérez to "not play games, because [Pérez] and whoever said Hanna bit him/her are going to be in serious trouble." Arsuaga also insulted Pérez and threatened to get an attorney. At 4:55PM, Arsuaga sent another email to Pérez and Corey J. Coleman, Chief Component Human Capital Officer, calling Pérez "such a dirty individual capable of lying and fabricating such a lie" regarding her "innocent dog." Arsuaga vowed that Pérez would "pay for it."

At 4:57PM, Corey J. Coleman ("Coleman") replied to Arsuaga's above email and instructed her to stop sending inappropriate emails and warned her that any further email of that sort would be considered insubordination. Arsuaga did not heed such warning because she subsequently sent the following two emails.

At 5:21PM, she sent an email to Smith, stating, "[y]ou were informed by email, if you do not read your emails that is your problem. Information was sent to you via four (4) emails. Your intentions are more than evident; only showing lack of integrity and lack of intelligence." According to Arsuaga, her email corresponds to Smith's alleged "harassing" telephone conversation to counsel her on the proper accounting of timesheets, the use of cell phone in the workplace and other performance issues with Arsuaga.

At 6:15PM, Arsuaga sent another email to Smith, in which she said, in pertinent part, "I also want to add that you do not even know how to write in English, I do not know how you can be a federal employee. When you write to me, make sure you use spell check since your writing is full of spelling mistakes."

The next day, on January 17, 2018, Arsuaga allegedly hung up the phone on Heather Briggs, Equal Rights Advisor, and then failed to answer any of her subsequent calls. Arsuaga denies this incidence.

In light of the above, Pérez maintains that he consulted with Kirsten Gunsolus, Labor and Employee Relations Specialist, to seek guidance with respect to Arsuaga's misconduct, recent performance issues, improper emails, and accommodation for her emotional support dog. According to Pérez, he conferred with Gunsolus about the next steps concerning Arsuaga's employment. Pérez sent Gunsolus documentation that, in his view, supported Arsuaga's termination. Pérez says that both of them assessed whether Arsuaga's termination of employment was warranted, and in doing so, Pérez considered: (1) Arsuaga's failure to follow supervisory instructions, which had a negative impact on the office's mission and functioning; (2) the fact that less than six months after being hired by FEMA, on March 10, 2017, Arsuaga was counseled by Pérez regarding her inappropriate and unprofessional tone in an email to Nancy Huffman (Travel Specialist); and (3) the fact that Arsuaga continued to engage in the same misconduct, even after having been counseled by her supervisor, and, therefore, (4) Pérez did not believe that Arsuaga would change her conduct and poor attitude in the future. According to Pérez, he decided to terminate Arsuaga's employment and Gunsolus agreed with that decision.

The next day, on January 18, 2018, Arsuaga's employment with FEMA was terminated. The Defendant maintains that her termination was warranted based on various incidents of inappropriate conduct, failure to follow instructions, and insubordination. The Defendant also claims that Arsuaga violated certain terms and conditions of her employment, as well as company policies and norms. Gunsolus assisted Pérez in drafting the Notice of Termination.

On January 23, 2018, Arsuaga appealed the Defendant's decision to terminate her employment. On January 29, 2018, Arsuaga was interviewed by the OER. On February 14, 2018, Arsuaga filed a formal complaint of employment discrimination with the OER. On March 26, 2018, James Montgomery, former Acting Deputy Director of OER, sent Arsuaga a letter acknowledging that on March 5, 2018, the OER received her discrimination complaint and that the filing date for such complaint was February 4,

2018. On July 11, 2018, the DHS denied Arsuaga's appeal challenging her termination. The present litigation followed.

In the case at hand, it is Arsuaga's contention that before her termination of employment, she was never admonished, reprimanded, or disciplined by her employer. It is also Arsuaga's position that the Defendant's claims of her alleged misconduct, insubordination, and performance issues are all false imputations. She also denies ever engaging in inappropriate conduct warranting termination.

### III.   **Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See,* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Sands v. Ridefilm Corp.,* 212 F.3d 657, 660 (1st Cir. 2000). A factual dispute is "genuine" if 'it may reasonably be resolved in favor of either party at trial" and "material" if it potentially affects the outcome of the case. *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006).

To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact in the record, *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir. 1997), through definite and competent evidence. *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir. 1994). The moving party thus bears the initial burden to demonstrate the lack of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325. Once the movant has averred that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-movant to establish the existence of at least one fact in issue that is both genuine and material. *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir. 1990) (citations omitted). If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. *Suarez v. Pueblo Int'l,* 229 F.3d 49, 53 (1st Cir. 2000). As such, to defeat summary judgment, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Nonetheless, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary

judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences. *See, Liberty Lobby, Inc.,* 477 U.S. at 255. The Court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 135, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. *Liberty Lobby, Inc.,* 477 U.S. at 248. Summary judgment is appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." *Forestier Fradera v. Mun. of Mayaguez,* 440 F.3d 17, 21 (1st Cir. 2006) (quoting *Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 173 (1st Cir. 2003)).

## IV. Discussion

Arsuaga brought this action against her former employer, the Defendant, asserting claims of disability discrimination, failure to reasonably accommodate, and hostile work environment pursuant to the Rehabilitation Act. The Defendant now moves for summary judgment requesting the dismissal of all claims, alleging that Arsuaga fails to meet her *prima facie* burden of proof to succeed in any of the pending claims. More specifically, the Defendant maintains that Arsuaga is not "disabled" within the definition of the ADA or the Rehabilitation Act and is not a "qualified individual" under those statutes, as required to prove her claims. Such inquiry is crucial here because the *sine qua non* requirement for Rehabilitation Act protection is whether Arsuaga has a disability as defined by the ADA. *See, Corujo–Marti v. Triple–S, Inc.,* 519 F. Supp. 2d 201, 212 (D.P.R. 2007). If Arsuaga cannot meet this standard, her claims under the Rehabilitation Act cannot prevail as a matter of law. Alternatively, the Defendant argues that, even if Arsuaga could make out a *prima facie* case for her claims, the Defendant proffers that its actions were not motivated by Arsuaga's alleged disability but rather were based on legitimate grounds. The Court addresses each claim in turn.

A.    The Claims of Disability Discrimination and Failure to
      Accommodate

In her complaint, Arsuaga alleges that she was discriminated against because of
her disability and was the victim of adverse employment actions on the part of her
employer, namely, her termination. Arsuaga also claims that her employer did not
provide her with a requested accommodation for her disability. The ADA and the
Rehabilitation Act prohibit discrimination against an otherwise qualified individual
based on his or her disability. The federal statutes barring discrimination based on
disability do more than merely prohibit disparate treatment; they also impose an
affirmative duty on employers to offer a "reasonable accommodation" to a disabled
employee. 42 U.S.C. § 12112(b)(5)(A). *García–Ayala v. Lederle Parenterals, Inc.,* 212 F.3d
638, 646 n.9 (1st Cir. 2000); *Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 19 (1st Cir.
2004). The Rehabilitation Act, the precursor to the ADA, applies to federal agencies,
contractors and recipients of federal financial assistance, while the ADA applies to
private employers with over 15 employees and state and local governments. *Calero-
Cerezo*, 355 F.3d at 19. Although the ADA does not apply here, the case law construing
the ADA generally pertains equally to claims under the Rehabilitation Act. *Id.*

In evaluating whether Arsuaga has put forth a *prima facie* case under the
Rehabilitation Act for her disability discrimination claim and failure to accommodate
claims, the Court must use the well-known burden-shifting framework delineated in
*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).[10]
Under this approach, to succeed in her disability discrimination claim, Arsuaga must
establish by a preponderance of the evidence that: 1) she was disabled within the
meaning of the ADA; 2) she was a qualified individual in that she was able to perform
the essential functions of the job, either with or without a reasonable accommodation;
and 3) the employer took adverse action against her because of the disability. *Bailey v.
Georgia–Pacific Corp.*, 306 F.3d 1162, 1166 (1st Cir. 2002). By contrast, to successfully

---

[10] In the absence of direct evidence of discrimination, like in the case at hand, courts apply the burden-shifting framework first established by the Supreme Court in *McDonnell Douglas., supra. See, Gillen v. Fallon Ambulance Service, Inc.,* 283 F.3d 11, 29–30 (1st Cir. 2002); *Tobin v. Liberty Mut. Ins. Co.,* 433 F.3d 100, 104 (1st Cir. 2005) (citing *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 264 (1st Cir. 1999)). Although *McDonnell Douglas* involved a claim under Title VII, and *Tobin* involved a claim under the ADA, the same standard of proof applies to claims under the Rehabilitation Act. *Calero–Cerezo,* 355 F.3d at 11 n.1 (citing *Oliveras–Sifre v. Puerto Rico Dep't of Health,* 214 F.3d 23, 25 n.2 (1st Cir. 2000)).

assert a <u>claim for failure to accommodate</u> under the Rehabilitation Act, Arsuaga must prove by a preponderance of the evidence that: (1) she suffered from a "disability" within the meaning of the statute; (2) she was a qualified individual in that she was able to perform the essential functions of her job, either with or without a reasonable accommodation; and (3) despite her employer's knowledge of her disability, the employer did not offer a reasonable accommodation for the disability. *See, Carroll v. Xerox Corp.,* 294 F.3d 231, 237 (1st Cir. 2002); *Calero–Cerezo,* 355 F.3d at 20.[11]

If, under the *McDonnell Douglas* burden-shifting analysis, Arsuaga can establish a *prima facie* disability discrimination or reasonable accommodation claim by making a sufficient showing as to each of the above elements, the burden shifts to the Defendant to articulate a legitimate, non-discriminatory reason for the employment decision and to produce credible evidence to show that the reason advanced was the real reason. *McDonnell Douglas,* 411 U.S. at 802. If the Defendant can offer such a reason, the burden then shifts back to Arsuaga to establish that the proffered reason is pretext intended to conceal discriminatory intent. *Id.* at 804. The ultimate burden of proving an unlawful action rests at all times with Arsuaga. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). *Ríos-Jiménez v. Principi*, 520 F.3d 31, 40–41 (1st Cir. 2008).

### 1.    Actual Disability

In any claim under the Rehabilitation Act, the plaintiff must first establish that she has a disability covered by the Act. *See, Tardie v. Rehab. Hosp. of R.I.,* 168 F.3d 538, 542 (1st Cir. 1999). Applying the above framework to the case at hand, to prove *both* her disability discrimination and failure to accommodate claims under the Rehabilitation Act, Arsuaga must first establish by sufficient credible evidence that she suffers from an "actual disability," as defined by the applicable laws. As such, this inquiry is decisive.

"[A]n 'individual with a disability' [is defined] as 'any person who . . . has a physical or mental impairment which substantially limits one or more of such person's major life activities' or 'has a record of such impairment' or 'is regarded as having such an

---

[11] Two other elements, sometimes noted by the First Circuit courts, but not discussed by either party in their briefs, require no discussion. It is undisputed that the Defendant is covered by the Rehabilitation Act, and that Arsuaga suffered in the terms and conditions of her employment because she was terminated.

impairment.'" *Rolland v. Potter,* 492 F.3d 45, 47 (1st Cir. 2007) (quoting 29 U.S.C. § 705(20)(B)). *McDonough v. Donahoe,* 673 F.3d 41, 46–47 (1st Cir. 2012). "[T]he *sine qua non* requirement for ADA protection, is whether the individual has a 'disability' as defined by the ADA." *Corujo–Marti v. Triple–S, Inc.,* 519 F.Supp.2d 201, 212 (D.P.R. 2007).

When considering whether an impairment qualifies as a disability under the ADA and, in turn, the Rehabilitation Act, the Court of Appeals for the First Circuit has established a three-part analysis. *Ramos–Echevarría v. Pichis, Inc.,* 659 F.3d 182, 187-188 (1st Cir. 2011). First, the plaintiff must establish that he or she suffers from a physical or mental impairment. *Id.* Second, the plaintiff must demonstrate that the impairment affects life activities that are "major," i.e., "of central importance to daily life." *Id.* Third, the plaintiff must show that the impairment "substantially limits" the identified major life activity. *Id. See, Carroll,* 294 F.3d at 238. "The burden is on the plaintiff to establish these three elements." *Calero–Cerezo,* 355 F.3d at 20 (internal citations omitted). *Castro-Medina v. Procter & Gamble Com. Co.*, 565 F. Supp. 2d 343, 358 (D.P.R. 2008). "It is well established that the determination of whether a plaintiff has a disability must be made on a case-by-case basis." *Calero–Cerezo,* 355 F.3d at 20 (*citing Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 198 (2002).

In assessing whether someone is disabled under the ADA, courts must consider the impairment's effect on the particular individual. *Ramos-Echevarria*, 659 F.3d at 187. The limitation caused by the impairment must be permanent or long-term. *Toyota Motor Mfg., Ky., Inc.,* 534 U.S. at 198; *see also,* 29 C.F.R. § 1630.2(j)(2)(ii), (iii) (1991). Evidence of a medical diagnosis of an impairment, standing alone, is insufficient to prove disability status. *See, Toyota Motor Mfg., Ky., Inc.,* supra. What is required is evidence showing that the impairment limits this particular plaintiff to a substantial extent. *See, Carroll,* 294 F.3d at 238 (quoting *Toyota Motor Mfg., Ky., Inc.,* 534 U.S. at 196–200) (internal quotation marks omitted). In other words, those seeking the Act's protection must "prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial." *Id.* (*citing Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 567, 119 S. Ct. 2162, 144 L. Ed. 2d 518 (1999)). Moreover, "[a]n individualized assessment of the effect of an impairment is particularly

necessary when the impairment is one whose symptoms vary widely from person to person." *Toyota Motor Mfg.,* 534 U.S. at 199. This individualized assessment is particularly necessary in the case at hand considering Arsuaga's depression diagnoses. *Castro-Medina*, 565 F. Supp. 2d at 362–63; *Cassimy v. Board of Educ. of Rockford Public Schools,* 461 F.3d 932 (7th Cir. 2006) (holding that whether depression gives rise to a substantial limitation on a major life activity for purposes of ADA depends on its severity).

### a. *Did Arsuaga suffer an impairment?*

Beginning with the first requirement of the First Circuit's three-part test, whether there is an impairment, the answer is in the affirmative. Arsuaga contends, under subsection (a), that she has physical and mental impairments—general major depressive disorder, general anxiety disorder, and recurring cancer. (*See,* Docket No. 1 at 3). Although the medical evidence submitted by Arsuaga is scant, the Defendant concedes that the record confirms her history of depression and that she was suffering from a mental impairment during the relevant period. (*See,* Docket No. 50-1 at 7). Furthermore, the First Circuit has recognized depression as a mental impairment that may constitute, at least in some circumstances, a disability under federal law. *See, Criado v. IBM Corp.,* 145 F.3d 437, 442 (1st Cir. 1998). Because the parties concede that Arsuaga suffers from an impairment—depression—the Court proceeds to examine the second and third factors in the disability analysis.[12]

### b. *Did Arsuaga's impairment affect a "major" life activity?*

Establishing disability under the ADA is an individualized inquiry. *Ramos-Echevarria*, 659 F.3d at 188. *See, Carroll,* 294 F.3d at 238. To prevail, a plaintiff must show that his impairment affects a "major life" activity. *Id.* A "major life activity"

---

[12] The Defendant *only* concedes that the record supports a finding that Arsuaga has a *mental* impairment but not a physical one. The Court agrees. In support of her claim that she has physical disabilities, Arsuaga solely points the Court to a conclusory statement in her Declaration Under Penalty of Perjury that she was diagnosed with recurrent cancer. Aside from her own statement of a diagnosis from an unknown date, by an unnamed doctor, Arsuaga did not offer any objective medical evidence showing that her recurrent cancer constitutes a physical impairment under the relevant law. "It is insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment." *Toyota Motor,* 534 U.S. at 198. Rather, those seeking the Act's protection must "prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial." *Id.* (citing *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 567, 119 S. Ct. 2162, 144 L. Ed. 2d 518 (1999)); *Castro-Medina*, 565 F. Supp. 2d at 362–63. On this record, no reasonable factfinder could conclude that Arsuaga suffered from a *physical* impairment as defined by the ADA or Rehabilitation Act.

is an activity of central importance to daily life. *See, Toyota Motor Mfg., Ky., Inc.,* 534 U.S. at 197. Major life activities are basic activities of daily life that an average person in the general population can perform with little or no difficulty—"functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (1991); *Ramos-Echevarria,* 659 F.3d at 187. Courts have required the plaintiff to specify the major life activity in which she claims to be substantially limited. *See, e.g., Berry v. T–Mobile USA, Inc.,* 490 F.3d 1211, 1216 (10th Cir. 2007); *Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship,* 209 F.3d 678, 683 (7th Cir. 2000).

Arsuaga claims that her physical and mental impairments limit her major life activities of sleeping, thinking, concentrating and working.[13] All four activities cited by Arsuaga have been recognized as "major." *See, Criado,* 145 F.3d at 442–43; *Lawson v. CSX Transp., Inc.,* 245 F.3d 916, 923 (7th Cir. 2001) (sleeping); *Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C.,* 258 F.3d 30, 33 n.4 (1st Cir. 2001) (thinking and concentrating); *Calero-Cerezo,* 355 F.3d at 21 (the Supreme Court has assumed, without deciding, that working itself may be considered a major life activity for purposes of the ADA); *see,* 527 U.S. at 492; *See, e.g., Bailey,* 306 F.3d at 1168 n.5; *Carroll,* 294 F.3d at 239; *Gelabert–Ladenheim v. American Airlines, Inc.,* 252 F.3d 54, 58 (1st Cir. 2001) (courts in the First Circuit have on occasion assumed *arguendo* that working might be deemed a major life activity under the Rehabilitation Act).

Although the activities specified by Arsuaga have been identified as "major," establishing disability under the ADA is an individualized inquiry and, as such, to prevail, Arsuaga must adduce evidence to show *how* her impairment affects a major life activity specified by her. *See, Ramos-Echevarria,* 659 F.3d at 188. The Defendant argues that Arsuaga did not offer evidence to show that her mental impairment limited or interfered with *any* of the major life activities she mentions. More specifically, the Defendant claims that the only medical evidence of record that could be used in this inquiry are progress notes from Dr. Maralexis Rivera, a psychiatrist. The Defendant nevertheless argues that such medical evidence does not demonstrate that the various life activities specified by Arsuaga (thinking, concentrating, sleeping, or working) were

---

[13] As discussed, Arsuaga only made a successful showing of a mental impairment, namely, depression.

limited in any way by her impairments. To the contrary, the Defendant observes that while the evidence shows that Arsuaga sought treatment from Dr. Rivera during her employment with FEMA, the physician reported that Arsuaga's symptoms were controlled, that she was sleeping well, there was no mention of work-related symptoms, no trauma or negative symptomatology were observed, and the findings were largely normal. Indeed, this evidence from Arsuaga's physician does not show that she is affected in any activity of central importance to her daily life.

In the same way, aside from pointing to her own declaration where she says in a conclusory fashion that her impairments (physical and mental) affect her major life activities of working, thinking, concentrating, and sleeping, Arsuaga has introduced no evidence showing any particular way in which her alleged conditions affects either her ability to think, concentrate, or sleep. Arsuaga solely rests on her conclusory allegations, unaccompanied by corroborating objective medical and non-medical evidence. She has therefore failed to introduce evidence to show that her mental impairment affects one or more of her "major" life activities of thinking, concentrating, and sleeping.

With respect to working, Arsuaga argues that in April 2011, the Social Security Administration found that her impairments were so severe that she was unable to engage in her prior line of work or in any other kind of substantial gainful work. Strangely, however, Arsuaga did not submit as evidence the decision by the Social Security Administration finding her to be disabled back in 2011. As such, the Court has no way of knowing, for example, what impairments the agency found to be severe and disabling and how Arsuaga was limited by such impairments in her daily life. Arsuaga also argues that in January 2015, she decided to participate in a Social Security Administration program called Trial Work, through which she began to work for the Defendant on an intermittent basis in July 2016. It is uncontested that at all relevant times for purposes of this litigation, Arsuaga worked for the Defendant. Far from showing that she is limited in her "major" life activity of working, participating in a job placement program shows that Arsuaga can work, and, in fact, she worked for the Defendant until she was dismissed in January 2018. In sum, Arsuaga's evidence shows that she was found disabled by the Social Security Administration in 2011, but that she later worked from

2016 to 2018. The evidence submitted by Arsuaga hardly proves that her impairments affect negatively her ability to perform the major life activity of work.

In sum, Arsuaga did not introduce evidence that her mental impairment affects any of her specified major life activities. Notwithstanding that determination, for purposes of discussion, the Court will assume *arguendo* that Arsuaga's evidence was enough to show that her mental impairment affects her ability to work. With this in mind, the Court proceeds to the third step in the disability analysis—whether Arsuaga's mental impairment "substantially" limits her ability to work.

c.    *Did the impairment "substantially limit" the identified major life activity?*

To satisfy the third element in a disability analysis under the ADA, a plaintiff must "prove a disability by offering evidence that the extent of the limitation in terms of her own experience . . . is substantial." *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 567, 119 S. Ct. 2162, 144 L. Ed. 2d 518 (1999); *Ramos-Echevarria,* 659 F.3d at 188. Although the federal statutes do not explicitly define the phrase "substantially limits," in *Sutton,* the Supreme Court instructed that the phrase "suggests 'considerable' or 'specified to a large degree.'" *See, Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491, 119 S. Ct. 2139, 2141–42, 144 L. Ed. 2d 450 (1999); *Calero-Cerezo,* 355 F.3d at 21–22. The EEOC defines "substantially limits," as follows:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). In applying this standard, a court must consider the nature and severity of the impairment, its expected duration, and its permanent or long-term impact. *See, Gillen v. Fallon Ambulance Service, Inc.,* 283 F.3d 11, 21 (*citing* 29 C.F.R. § 1630.2(j)(2)).

As applied to working, the EEOC defines "substantially limits" as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and

abilities. *Ramos-Echevarria*, 659 F.3d 182, 189 (1st Cir. 2011). The inability to perform a single, particular job does not constitute a substantial limitation . . . ." 29 C.F.R. § 1630.2(j)(3)(i) (1991); *Toyota Motor Mfg., Ky., Inc.,* 534 U.S. at 200, 122 S. Ct. 681 (citing *Sutton,* 527 U.S. at 492).

Applying the above standard, the Court must assess whether Arsuaga proved that her mental impairment (depression) substantially limited her ability to perform the major life activity of working. As before, the Defendant contested Arsuaga's claim that her impairments substantially limit any of her recognized major life activities. The Defendant argues that the record is simply devoid of evidence to satisfy the "substantially" limited threshold and the Court agrees. In the case at hand, to show that Arsuaga's impairments substantially limit her ability to work (or think, concentrate, and sleep,) she relies exclusively on two pieces of evidence: her own Declaration Under Penalty of Perjury and a finding of disability by the Social Security Administration that dates back to April 2011. Even giving Arsuaga all benefits of a doubt, her evidence is insufficient to support her claims.

With respect to Arsuaga's use of her own declaration, her reliance on such evidence is misguided. Arsuaga offers only an unsupported, self-serving, and conclusory allegation that her major life activities were substantially limited by her impairments. Yet, the conclusory assertions made by Arsuaga in her declaration are not corroborated by any evidence. For instance, she does not provide any specifics to show that the extent of her limitation in terms of her own experience is substantial. Arsuaga did not submit medical records or any other objective medical or non-medical evidence chronicling her mental limitations associated by her alleged condition. Arsuaga's declaration also fails to identify, in terms of her own experience, with specific facts, the major life activity in which she is allegedly substantially limited. Similarly, she did not offer any evidence on the nature and severity of her alleged impairment, its expected duration, and its permanent or long-term impact. *See, Gillen,* 283 F.3d at 21 (*citing* 29 C.F.R. § 1630.2(j)(2)).

Arsuaga's declaration, without more, is indeed insufficient to meet the evidentiary standard and is therefore inadequate to carry the day against a motion for summary judgment in a Rehabilitation Act case. *See also, Robbins v. American Preferred*

*Management Co., Inc.,* No. 05–CV–182, 2007 WL 2728746, at *8 (W. D. Mich. September 17, 2007) (plaintiff's own deposition testimony fails to establish disability under the ADA); *Corujo–Marti,* 19 F. Supp. 2d 201 (D.P.R. 2007). "[I]n general, unsupported self-serving statements by the plaintiff regarding the severity of a disability are insufficient to carry the day against a motion for summary judgment in an ADA case." *LaBrecque v. Sodexho USA, Inc.*, 287 F. Supp. 2d 100, 108 (D. Mass. 2003). *See also, Burks v. Wisconsin Dept. of Transp.,* 464 F.3d 744, 756 (7th Cir. 2006) ("bald and self-serving assertions in affidavits, unsubstantiated by any documentation or other testimony, are not sufficient to create a material issue of fact as to whether an impairment has substantially limited a major life activity.")

In addition to her own declaration, however, Arsuaga points to a document by the Social Security Administration ("SSA") which says that she had been found disabled by that agency in April 2011. This evidence is also lacking. First, the document is not the official decision by the SSA wherein an Administrative Law Judge goes through the sequential evaluation required under Social Security law and makes factual findings, including a claimant's severe impairments and his or her residual functional capacity, and ultimately decides whether a claimant is disabled under the law. The agency's official decision finding Arsuaga disabled in April 2011 is not part of the record.[14] Rather, the document submitted by Arsuaga to escape summary judgment is one that merely states that based on the prior SSA decision, an ALJ found that her impairments (the Court does not know which ones) were so severe that she was unable to perform her previous job or to engage in any other kind of gainful work, 42 U.S.C. § 423(d)(2)(A). The document does not mention what impairment, or combination of impairments, the SSA considered in its decision to find Arsuaga to be too disabled to work. The document merely explains that Arsuaga was entitled to receive monthly social security disability benefits beginning in September 2011.

---

[14] The Court makes a note of this because, although the SSA's decision finding Arsuaga to be disabled to work in April 2011 is not dispositive to the Court's analysis here, it would have been helpful to know, for example, which of the Plaintiff's alleged impairments the ALJ found to be severe under Social Security law and her related limitations.

Second, the document omits any discussion on the nature and severity of Arsuaga's impairment(s), how she is limited by such impairment, the impairment's expected duration, its permanent or long-term impact, or any evidence recounting her limitations associated with her alleged conditions. Indeed, the document does not discuss, in terms of Arsuaga's own experience, how her condition(s) substantially limit her ability to work. Basically, the document has no relevant information to uphold a finding that Arsuaga is disabled as defined by the ADA.

Third, the document shows that the SSA found Arsuaga to be disabled in April 2011, but the relevant facts of this case all occurred between July 2016 and January 2018. Because the phrase "substantially limits" appears in subsection (A), § 12102(2)(A), in the present indicative verb form, the language is properly read as requiring that a person be *presently*—not in the past or potentially or hypothetically—substantially limited in order to demonstrate a disability. *See, Sutton*, 527 U.S. at 472. A "disability" exists only where an impairment "substantially limits" a major life activity in the present or relevant timeframe. The evidence submitted by Arsuaga does not discuss whether Arsuaga was substantially limited during the relevant period—from July 2016 to January 2018.

Fourth, a finding of disability under Social Security law is not equivalent to a finding of disability under the ADA and Rehabilitation Act. Indeed, Arsuaga was found to be disabled and eligible to receive disability insurance benefits by the SSA in April 2011, but that decision is not dispositive here. Further bolstering that conclusion is the fact that Arsuaga does not point to any legal authority or case law to validate the proposition that a *prior* finding of disability by the SSA, on its face, and without more, supports a finding of disability under the ADA or Rehabilitation Act. Based on the foregoing, the document from the SSA submitted by Arsuaga is not, as she seems to suggest, a smoking gun to show that she has an actual impairment that *substantially* limits her in one or more of the major life activities she specified.

Finally, concerning Arsuaga's burden as applied to working, specifically, there is no evidence to show that her mental condition substantially limits her from working in any broad class of jobs or any broad range of jobs in various classes. *See, Ramos-Echevarria*, 659 F.3d at 190; *See, Carroll,* 294 F.3d at 239. The record contains no expert

vocational testimony or labor market statistics supporting a contention that Arsuaga's condition substantially limits her from performing jobs other than her own. *Id*.

To wrap it up, the Court finds that Arsuaga has made "little effort . . . to establish that [her] impairment[s] substantially [limit] one or more of [her] major life activities." *See, Castro-Medina*, 565 F. Supp. 2d at 363 (citing *Rolland,* 492 F.3d at 49). *See also, Miller v. Ameritech Corp.,* 214 Fed. Appx. 605, 608–609 (7th Cir. 2007) ("To survive summary judgment, a plaintiff must provide specific facts as to whether [s]he is substantially limited in a major life activity . . . conclusory allegations will not do."). "[A] conclusory allegation without evidentiary support" is insufficient to carry Arsuaga's burden of establishing a *prima facie* case. *Ramos-Echevarria*, 659 F.3d at 190 (citing *Carroll,* 294 F.3d at 240). In the present case, it is a simple matter to conclude that the record does not support a finding that Arsuaga is "substantially limited"—as that term is defined in the ADA—in her ability to work or in any other major daily life activity.

In any claim under the Rehabilitation Act, the plaintiff must first establish that she has a disability covered by the Act. *See, Leary v. Dalton,* 58 F.3d 748, 752 (1st Cir. 1995); *Tardie v. Rehab. Hosp. of Rhode Island*, 168 F.3d 538, 542 (1st Cir. 1999). Here, Arsuaga was unable to establish by sufficient credible evidence that she suffers from an "actual disability" under the applicable law. Having so concluded, summary judgment is appropriate on Arsuaga's claims for disability discrimination and failure to reasonably accommodate pursuant to the Rehabilitation Act. Even so, the Court will discuss alternative grounds that further support the dismissal of these claims and turns to the second element of a *prima facie* case, whether Arsuaga was a "qualified individual."

## 2.    Qualified Individual

Viewing the record in the light most favorable to Arsuaga, the Court finds that she fell well short of proving the second element of her *prima facie* burden, that she is a qualified individual under the ADA and Rehabilitation Act. Recapping, to succeed in her claims of disability discrimination and failure to provide a reasonable accommodation, Arsuaga must make out a *prima facie* showing of three elements, the first two of which are the same for both claims, namely, (1) that she was disabled within the meaning of the ADA (which was just discussed above and Arsuaga fails to meet); and (2) that she

was a qualified individual able to perform the essential functions of her job, either with or without a reasonable accommodation. The third element varies for each claim.

The ADA defines a "qualified individual with a disability" as follows: "an individual with a disability who, with *or without* reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8). "[T]he burden is on the employee to show: first, that she possesses the requisite skill, experience, education and other job-related requirements for the position, and second, that she is able to perform the essential functions of the position with or without reasonable accommodation." *Garcia–Ayala v. Lederle Parenterals, Inc.,* 212 F.3d 638, 646 (1st Cir. 2000) (internal citations and quotation marks omitted). *See, Castro-Medina*, 565 F. Supp. 2d at 368.

In the case at hand, there is no question as to the first part of the test, specifically, that Arsuaga possesses the requisite skill, experience, and education to perform the essential duties of her job with FEMA as a Human Resources Specialist. The Defendant does not challenge the fact that Arsuaga has ample experience in the human resources field, that she practiced in that field since she was 21 years old and that she had plenty prior work experience, having at least twelve (12) previous employers. Therefore, a fact finder might easily find that Arsuaga had the requisite skill and experience for the position of Human Resources Specialist.

According to the Defendant, however, Arsuaga does not meet the second part of the test because she did not possess the ability to function competently and productively in the workplace, either with *or without* a reasonable accommodation. The Defendant claims that a personal accommodation like the use of a service animal in the workplace is unreasonable *per se* under 42. U.S.C. § 12111(9) and 29 C.F.R. § 1630(o). The Defendant, however, does not offer further argumentation aside from its own conclusory remark, nor did it cite to relevant legal authority to support its proposition. In addition to the nonexistence of well-developed argumentation, the Defendant's own actions prove sufficient to disprove this theory. At the outset, it is beyond the Court's comprehension that the Defendant now argues that having an emotional support dog in the workplace is an unreasonable accommodation *per se* when, as Plaintiff correctly points out, the Defendant granted that precise accommodation to the Plaintiff on various

occasions. The Defendant allowed the Plaintiff to have her emotional support dog with her while on duty, first during trainings, and then in the workplace and during her deployments. The Court therefore finds that the Defendant's argument does not pass muster. That finding, however, does not prove fatal to the Defendant's cause because, on this record, and as a matter of law, Arsuaga does not meet the second prong of the *prima facie* case.

From the Plaintiff's complaint and her opposition to summary judgment, it is evident that Arsuaga argues that she was a qualified individual who was able to perform the essential functions of her job *only if* a reasonable accommodation was provided by the Defendant: having her emotional support dog at the workplace. In the complaint, for example, Arsuaga explicitly attested:

> Plaintiff was qualified to perform the essential functions of
> her employment position, *with reasonable accommodations*,
> so long as she worked in an environment free from hostility,
> abuse and intimidation.

(Docket No. 1 at 3). Similarly, Arsuaga reiterated both in her opposition brief and her declaration that she was "qualified to perform the essential functions of her employment position, *with* the reasonable accommodation of having her emotional support dog Hanna, while on duty." (Docket No. 62 at 12). But Arsuaga does not claim that she could perform her job *without* an accommodation, as required. Arsuaga neither alleges, nor attempts to argue, that she had the capacity to perform her job *without* having an accommodation. Arsuaga has therefore made pellucid that she could *only* perform the essential functions of her job with the Defendant *with* an accommodation, more specifically, having her emotional support dog at the workplace.

Arsuaga's admissions are problematic because if she *cannot* perform the essential duties of her job *without* an accommodation, she is automatically disqualified from meeting the "qualified individual" threshold under the Rehabilitation Act. The burden is on the plaintiff to show that she is able to perform the essential duties of the employment position *with or without* a reasonable accommodation. 42 U.S.C.A. § 12111(8); *Garcia-Ayala,* 212 F.3d at 646. Based on the foregoing, the Court can easily conclude that no reasonable jury could find that Arsuaga, while suffering from a disability under the ADA, still possessed the ability to function competently and productively in the

workplace, either with *or without* a reasonable accommodation. As such, Arsuaga fails to meet the second element of a *prima facie* case—that she is a qualified individual under the ADA. As such, she cannot succeed in a disability discrimination claim or a failure to provide a reasonable accommodation claim under the Rehabilitation Act.

There is also *other* evidence in the record that further confirms such conclusion. First, it is undisputed that immediately upon being hired by FEMA, Arsuaga submitted an accommodation request to be allowed to attend the initial training programs with her emotional support dog. Such request was immediately granted by the Defendant on an interim basis. The evidence further shows that Arsuaga later expanded her initial accommodation request to include having her dog with her in the workplace and during deployments. It is undisputed that the Defendant quickly approved Arsuaga's (second) request, which was granted on an interim basis for one (1) year and was set to expire on January 3, 2018. The record also shows that, on January 11, 2018, Arsuaga attended a meeting with Equal Rights Advisors Victor González and María Rodríguez, and Sam Ross, Human Resources Manager, regarding the expiration of her interim accommodation. After that meeting, Arsuaga submitted a formal request to extend her interim accommodation. The actions that Arsuaga took next prove dispositive to the qualified individual inquiry.

After the abovementioned meeting, Arsuaga informed Pérez, and the other meeting attendees, that she would *not* be reporting for duty at the FEMA facility she was assigned to at the time unless and until her January 2018 request to extend her accommodation was approved. Arsuaga later reiterated to her supervisor Pérez that she would *not* be "reporting to the JFO without [her] emotional support dog." Thus, the record unequivocally shows that Arsuaga herself made pellucid to her employer that she would *not* return to work *without* her accommodation for her emotional support dog. Plaintiff's statements are fatal to her cause.

First, at the risk of stating the obvious, attendance is an essential function of any job. *Ríos-Jiménez v. Principi*, 520 F.3d 31, 42 (1st Cir. 2008) (holding that employee who frequently missed work was not a qualified individual able to perform the essential functions of her job, either with or without a reasonable accommodation, as required to support a disability discrimination and reasonable accommodation claim under the

Rehabilitation Act). *See also, Castro-Medina,* 565 F. Supp. 2d at 369 (D.P.R. 2008); *Waggoner v. Olin Corp.,* 169 F.3d 481, 485 (7th Cir. 1999) ("an employee who does not come to work cannot perform the essential functions of his job") (quoting *Nowak v. St. Rita High Sch.,* 142 F.3d 999, 1003 (7th Cir.1998)); *Rogers v. Int'l Marine Terminals, Inc.,* 87 F.3d 755, 759 (5th Cir. 1996). Second, yet again, Arsuaga's own actions confirm that she was unable to perform the essential duties of her position *without* her requested accommodation—having her emotional support dog with her while on duty.

On this record, therefore, a reasonable factfinder can easily conclude that Arsuaga did not have the ability, nor desire, to function competently and productively in the workplace *without* an accommodation. "If the plaintiff, with *or without* a reasonable accommodation, cannot perform an essential function of the job, then [s]he is *not* a qualified individual and there is no duty to accommodate." *Calef,* 322 F.3d at 86 n.8.

Considering the undisputed record of this case, and the law, even examining the facts in the light most favorable to Arsuaga, this Court is unable to find that Arsuaga established the second prong of her *prima facie* burden—that she was a "qualified individual" able to perform the essential functions of her job, either with or without a reasonable accommodation. By failing to prove by a preponderance of the evidence the necessary elements to make out a *prima facie* case, Arsuaga could not establish a disability discrimination claim or a failure to provide a reasonable accommodation claim under the Rehabilitation Act. *See, Bailey v. Georgia–Pacific Corp.,* 306 F.3d 1162, 1166 (1st Cir. 2002); *Calero–Cerezo,* 355 F.3d at 20. Summary judgment is therefore appropriate on both claims.

There is no need to engage in a discussion of the third element of plaintiff's *prima facie* burden for either of Arsuaga's above claims. Notwithstanding that, however, because it provides further grounds in support of the dismissal of these claims, the Court will briefly discuss the final element of a failure-to-accommodate claim.

### 3.      Denial of Accommodation

Arsuaga alleges that the Defendant failed to accommodate her by not approving her January 11, 2018, request to extend her accommodation to have her emotional support dog with her at the workplace and during deployments. To succeed in her failure to provide a reasonable accommodation claim, in addition to proving the first and second

prongs of the *prima facie* case, which she does not, Arsuaga must also establish through credible evidence the third element—that despite knowing about Arsuaga's disability, the employer did not acquiesce to her request for an accommodation (or did not reasonably accommodate her limitations). *Calero–Cerezo,* 355 F.3d at 20. On this evidentiary record, no reasonable fact finder could conclude that the Defendant failed to offer Arsuaga a reasonable accommodation.

Under the ADA, the term "discriminate" includes . . . "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A). *Castro-Medina*, 565 F. Supp. 2d at 374. As such, if an employer, aware of an employee's disability, *refuses to provide* a requested reasonable accommodation, the employer violates the Rehabilitation Act, unless it can show that the proposed accommodation would pose an undue hardship for its business. *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 2001).

For Arsuaga to meet her burden, she must prove that the employer, despite knowing of her disability, did *not* acquiesce to, or approve, her request for accommodation. *Calero–Cerezo,* 355 F.3d at 20. It is undisputed that on January 11, 2018, Arsuaga submitted a formal request to her employer to extend her previously approved interim accommodation to have her emotional support dog at the workplace. On one hand, Arsuaga conveniently claims that the Defendant *never* approved such request. On the other hand, the Defendant claims that, around the time that Arsuaga submitted the accommodation request, several complaints concerning Arsuaga's dog were brought to Pérez' attention, including complaints of incidents where the dog allegedly bit more than one FEMA employee, sanitary concerns with the dog, and behavioral issues like barking and physical aggressions with FEMA employees. Based on those complaints, the Defendant maintains that Arsuaga's request to extend her accommodation was placed on

hold pending a review by FEMA's OER and Pérez due to the dog's purportedly aggressive and disruptive behavior.[15]

The Court cannot weigh the evidence nor make credibility determinations at this juncture, but the Court need not resolve the parties' different factual accounts to be able to determine whether Arsuaga adduced sufficient evidence that the Defendant, or any of its employees, *denied* her January 11, 2018, request for accommodation. She did not and the Court explains.

After she submitted her accommodation request, a series of events unfolded between Arsuaga, Pérez and other FEMA personnel, which, according to the Defendant, culminated with the decision to terminate Arsuaga's employment. It is undisputed that on January 18, 2018, Arsuaga's employment with FEMA was terminated. The reasons surrounding Arsuaga's termination are immaterial to this discussion and need not be examined. By contrast, the crux of the matter is whether the Defendant *denied* Arsuaga's accommodation request. The evidence of record shows that Arsuaga's request to extend her accommodation was *never actually denied* by the Defendant because, amid the decision-making process of whether to approve such request, the Defendant terminated Arsuaga's employment. The record also shows that the decision to terminate Arsuaga was made *before* the Defendant made a final decision with respect to her accommodation.

Furthermore, there is evidence in the form of email communications, that the Defendant, and more specifically Pérez, *intended to approve* Arsuaga's request and was working towards that end. Indeed, this does not benefit Arsuaga's cause. But even assuming that Pérez did not intend to approve it, the fact of the matter is that Arsuaga did not offer any evidence demonstrating that a *final* decision was ever made by the employer with respect to her request to extend her accommodation, let alone a decision *denying* her accommodation. In sum, Arsuaga did not establish through credible evidence that despite knowing about her disability, the employer did not acquiesce to her request for an accommodation (or did not reasonably accommodate her limitations). *See, Calero–*

_____

[15] There is evidence of complaints lodged against Arsuaga's dog by FEMA personnel. This evidence comes from emails, some of which, as explained previously, are objected to by Arsuaga on hearsay grounds. Arsuaga denies any incident of bad behavior with her dog. The Court does not weigh the credibility of these differing accounts but considered this evidence, not for the truth of the matter asserted in it, but to show that a communication was made.

*Cerezo,* 355 F.3d at 20. Thus, the Court finds no violation of the Rehabilitation Act on the part of the Defendant as it did not deny Arsuaga's accommodation request. Consequently, Arsuaga cannot establish the third element of her *prima facie* burden and Arsuaga's failure-to-accommodate claim fails on these grounds as well.

      B.    <u>Retaliation Claim</u>

In the complaint, Arsuaga asserted a claim of retaliatory termination based on her disability "because she engaged in protected activities, in violation of Title VII." (Docket No. 1 at 16). More specifically, Arsuaga claimed that her employment with FEMA was terminated in retaliation "for having engaged in protected activities—namely, requesting [a] reasonable accommodation [for her disabilities] and complaining of disability-based harassment." (*Id*. at 17). The Court previously held in its Opinion and Order on the Defendant's Motion to Dismiss that Title VII bars only discrimination on the basis of race, color, religion, sex, and national origin, but does *not* provide a cause of action for claims of *disability*-based discrimination or retaliation. (Docket No. 47).

Title VII does not encompass disability discrimination claims, like the ones asserted by Arsuaga in the present case. The Court therefore held that because Arsuaga's claims are exclusively grounded on disability discrimination and failure to accommodate her disability, her claims are not cognizable under Title VII and consequently cannot survive dismissal. *See, Fantini v. Salem State College,* 557 F.3d 22, 32 (1st Cir. 2009) (affirming the district court's dismissal of Appellant's Title VII retaliation claim because the alleged "misconduct" that she "complained about" was not an unlawful employment practice under Title VII); *see also, Torres-Alman v. Verizon Wireless Puerto Rico, Inc.,* 522 F. Supp. 2d 367, 381 (D.P.R. 2007) (disability discrimination claims cannot be brought pursuant to Title VII); *Villegas–Reyes v. Universidad Interamericana de P.R.*, 476 F. Supp. 2d 84, 92 (D.P.R. 2007) (*sua sponte* dismissal with prejudice for failure to state a Title VII claim is warranted where plaintiff only alleged discrimination based on age and disability); *Marrero v. Schindler Elevator Corp.*, 494 F. Supp. 2d 102, 111 (D.P.R. 2007) (same).

Accordingly, Arsuaga's retaliation claims, which were only premised under Title VII, were **DISMISSED with prejudice**. (Docket No. 47). On summary judgment, however, the Defendant argues in favor of the dismissal of Arsuaga's retaliation claim

and contends that she is unable to establish a retaliation *under the Rehabilitation Act* because her retaliation claim was premised under Title VII. In its brief, the Defendant unnecessarily proceeded to argue substantively why Arsuaga also fails to establish a claim for retaliation under the Rehabilitation Act. The Defendant correctly points out that Plaintiff improperly lodged a retaliation claim under Title VII and alleged in the complaint that her termination was in retaliation for having engaged in protected activity in violation of Title VII—and *not* the Rehabilitation Act. In her opposition to summary judgment, Arsuaga, in turn, argued *for the first time* that there is evidence in the record to support a claim for retaliation under the Rehabilitation Act.

To be sure, Arsuaga did not assert a retaliation claim under the Rehabilitation Act in the complaint and thus, no such claim is conceivable at this juncture. The undersigned will not allow Arsuaga's attempt (even if unintentional) to amend her allegations through an opposition pleading at the summary judgment stage to include a claim for retaliation under the Rehabilitation Act when no such claim was asserted in the complaint. *See, Alamo Rodríguez v. Pfizer,* 286 F. Supp. 2d 144 (D.P.R. 2003). It is one matter that the Court must analyze the factual scenario in this case construing the facts, the record, and all reasonable inferences, in the light most favorable to the Plaintiff. *See, Corujo-Marti v. Triple-S, Inc.*, 519 F. Supp. 2d 201, 213–14 (D.P.R. 2007); *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000). It is another matter entirely to allow the Plaintiff to bring forth new never raised causes of actions and allegations under new statutes, which were not properly brought in the complaint or during the allowed timeframe to amend the pleadings. *See, Corujo-Marti*, 519 F. Supp. 2d at 213–14. The Court is not obliged to search the record, where Plaintiff failed to request to amend the complaint, in order to set forth her new cause of action, allegations, and theories. *Celotex,* 477 U.S. at 324, 106 S. Ct. at 2553; *Barge v. Anheuser–Busch, Inc.,* 87 F.3d 256, 260 (8th Cir.1996); *Alamo,* 286 F. Supp. 2d at 144; *Vega Rodríguez v. Loctite Puerto Rico, Inc.,* 967 F. Supp. 653, 658, n.7 (D.P.R. 1997). *See also, Dávila Rivera v. Caribbean Refrescos, Inc.,* 2004 WL 1925477 (D.P.R. 2004).

In the case at hand, there is no question that Arsuaga premised her retaliation claim solely under Title VII in her complaint, and not under the Rehabilitation Act. For that reason, the Court correctly dismissed with prejudice Arsuaga's *sole* retaliation claim. Arsuaga did not seek reconsideration of that decision. As it stands, there is no retaliation claim currently pending before the Court, so there is no need for further discussion on this already dismissed claim.

C.   Hostile Work Environment Claim

Pursuant to the Rehabilitation Act, "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, . . . be subjected to discrimination under any program or activity . . . ." *Rolland,* 492 F.3d at 47 (quoting 29 U.S.C. § 794(a)).[16] Arsuaga argues that she was subjected to a hostile work environment due to her disability in violation of the Rehabilitation Act. More specifically, she broadly claimed in the complaint that she was subjected to a hostile work environment since she began working for the Defendant in July 2016. She further declared that "[s]ince Arsuaga's arrival at Anniston, Alabama, for FEMA training, on July 11, 2016, and up to January 18, 2018, she was subjected to continuous hostile-work-environment-harassment perpetrated by FEMA's managerial and supervisory employees, co-workers and security guards by reason of the reasonable accommodation for her disability." (Docket No. 1).[17] The Defendant has requested the dismissal of Arsuaga's hostile work environment claim because she cannot meet her evidentiary burden.

In order to succeed in a hostile work environment claim, Arsuaga must show the following elements: (1) that she was disabled as defined under the ADA and Rehabilitation Act, (2) that she was subjected to uninvited harassment, (3) that her

---

[16] In *Quiles–Quiles v. Henderson* 439 F.3d 1 (1st Cir. 2006), the First Circuit noted that it had not yet decided whether disability harassment was a "viable theory of recovery" but nonetheless assumed that it was. *Id.* at 5 n.1. The Court understands that the First Circuit still has not directly addressed this issue. For purposes of this opinion and order, the Court follows *Quiles–Quiles* and assumes without deciding that disability harassment is a viable theory of recovery. *McDonough v. Donahoe,* 673 F.3d 41, 46, n.9 (1st Cir. 2012).

[17] Arsuaga rests her hostile work environment claim on a myriad of incidents that she alleges occurred since she was hired by FEMA in July 2016 all through her termination of employment on January 18, 2018. Arsuaga specifically mentions thirteen (13) events, the majority of which involve different FEMA employees at different locations. The allegedly harassing events narrated by Arsuaga rest solely on her Declaration Under Penalty of Perjury, and as argued by the Defendant, on Arsuaga's self-serving and conclusory portrayal of the facts. Because those alleged events that Arsuaga puts forth in support of her hostile work environment claim have no bearing on the final outcome, the Court needs not discuss the specifics.

employer's conduct was based on her disability, (4) that the conduct was so severe or pervasive that it altered the conditions of her work and created an abusive work environment, and (5) that the harassment was objectively and subjectively offensive. *See, Prescott v. Higgins,* 538 F.3d 32, 42 (1st Cir. 2008); *see also, Ríos–Jiménez,* 520 F.3d at 43.

In her brief in opposition to summary judgment, however, Arsuaga did not offer a single word of discussion, evidence, or developed argument with legal authority to demonstrate that she met all five (5) requisite elements to succeed in her hostile work environment claim. Arsuaga's discussion was strictly limited to arguing that she suffered disability-based harassment that was sufficiently "severe and pervasive." This is only *one* element of the five-part *prima facie* burden that Arsuaga had to prove.[18] Strictly construing the case law, the Court should find that Arsuaga has waived her arguments to survive judgment because she did not argue in her brief to this Court that she met her burden of proof to make out a *prima facie* case of hostile work environment under the Rehabilitation Act. *See, United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). *See also, Curet-Velázquez v. ACEMLA de P.R., Inc.*, 656 F.3d 47, 54 (1st Cir. 2011) ("[a]rguments alluded to but not properly developed before a magistrate judge are deemed waived"); *Coons v. Indus. Knife Co., Inc.*, 620 F.3d 38, 44 (1st Cir. 2010).

Alternatively, the Court can easily dispose of Arsuaga's hostile work environment claim on substantive grounds as well because she cannot meet the first element of her *prima facie* burden—that she was disabled as defined under the ADA. For brevity purposes, the Court borrows from its previous discussion of this inquiry at Section IV(A)(1), *supra*. As noted above, "an 'individual with a disability' [is defined] as 'any person who . . . has a physical or mental impairment which substantially limits one or more of such person's major life activities' or 'has a record of such impairment' or 'is regarded as having such an impairment.'" *Rolland,* 492 F.3d at 47 (quoting 29 U.S.C.

---

[18] To prove this element, a plaintiff must show that her "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment." *Quiles–Quiles v. Henderson,* 439 F.3d 1, 7 (1st Cir.2006) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (applying "severe and pervasive" standard in disability harassment case under the Rehabilitation Act)). Among the factors relevant to this inquiry are "the severity of the conduct, its frequency, and whether it unreasonably interfered with the victim's work performance." *Id.; see also, Harris,* 510 U.S. at 23, 114 S. Ct. 367.

§ 705(20)(B)); *McDonough*, 673 F.3d at 47. To recapitulate, to qualify as "disabled" under the Act's disability definition, "[w]e apply a three-part analysis." *Ramos–Echevarría,* 659 F.3d at 187–188. First, the plaintiff must establish that she suffers from an impairment. *Id*. Next, the plaintiff must show that the impairment affects a major life activity, and third, that the impairment substantially limits the major life activity. *Id. See, also, Rolland,* 492 F.3d at 48.

Arsuaga sufficiently showed that she has a mental impairment (depression), so she met the first part of the required three-part test. Nonetheless, she fell well short of proving that such impairment substantially limits any of the four major life activities that she specified in the complaint. As thoroughly discussed in the preceding sections, the record before the Court lacks sufficient credible evidence to support a finding that Arsuaga was "substantially" limited in either sleeping, thinking, concentrating, or working, by reason of her mental impairment. As such, Arsuaga could not meet her burden of proof to establish that she has an actual disability as defined by the ADA and Rehabilitation Act. The first step in any claim under the Rehabilitation Act is establishing a disability covered by the Act and Arsuaga has failed to show that she was disabled under the required statutes. *See, Tardie,* 168 F.3d 538 at 542 ("In any claim under the Rehabilitation Act, the plaintiff must first establish that she has a disability covered by the Act."). *See, McDonough*, 673 F.3d at 49–50.

Accordingly, the Court need not reach the remaining elements of a *prima facie* case for a hostile work environment claim under the Rehabilitation Act. Summary judgment is proper as to this claim.

## V.   Conclusion

Based on the foregoing, the Court **GRANTS** the Defendant's motion for summary judgment at Docket No. 50. All claims asserted by the Plaintiff in the present action are hereby **DISMISSED with prejudice.**

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 24th day of March 2022.

MARSHAL D. MORGAN
United States Magistrate Judge